United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY WALTER LYTLE, | No. C 03-4414 SI (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| ED S. ALAMEIDA, JR., Director of California Dept. of Corrections | |
| Respondent. | |

## INTRODUCTION

Jerry Walter Lytle, a California prisoner, filed this pro se action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court dismissed some claims and ordered respondent to show cause why the second amended petition should not be granted. Respondent filed an answer, and Lytle filed a traverse. For the reasons stated below, the second amended petition will be denied.

## BACKGROUND

The California Court of Appeal described the evidence at trial in much greater length, but the basic facts of the crime are as follows: "Defendant and the victim, Robin Perkins, lived in a small trailer in Santa Cruz. When Perkins drank alcohol, she physically and verbally abused defendant. One night, after an evening of verbal abuse, defendant left the trailer, retrieved his shotgun from his truck, aimed it through the window of the trailer, and shot and killed Perkins." Respondent's Exh. C (Cal. Ct. App. Opinion, p. 2). There was evidence that the victim had

suffered a contact wound, i.e., the muzzle of the gun was in contact with the victim's body when it was discharged. At the time Lytle fired, the barrel of the gun was about 5-6 inches into the window. Id. at 8. "The bulk of the shotgun, including the shell, the firing mechanism, and the trigger, as well as defendant himself were outside the trailer when he discharged the weapon." Id. at 12-13.

Lytle was convicted by a jury in Santa Cruz County Superior Court of second degree murder and discharging a firearm at an inhabited dwelling. See Cal. Penal Code §§ 187, 246. The jury found true the enhancement allegations for personally discharging a firearm causing great bodily injury or death and personally using a firearm. See Cal. Penal Code §§ 12022.53, 12022.5. The jury also found that Lytle inflicted great bodily injury as to the second count. Cal. Penal Code § 12022.7. A new trial was granted as to the murder conviction, and the state dismissed the murder charge without prejudice to further prosecution. The sentence enhancement under § 12022.7 was stayed. The state court of appeal struck the § 12022.5 sentence enhancement. Respondent's Exh. C (Cal Ct. App. Opinion, p. 37).

Lytle is now serving a prison term of 32 years to life: 7 years on the § 246 offense and a consecutive term of 25 years to life for the § 12022.53 enhancement.

Lytle filed his petition for writ of habeas corpus over three years ago. After exhausting his state court remedies, Lytle filed a second amended petition. The second amended petition contained 29 claims. The court issued an order of partial dismissal and order to show cause, dismissing all but five of Lytle's claims.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Cruz County, within this judicial district. 28 U.S.C. §§ 84, 2241 (d).

2

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claims presented in the second amended petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state

court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

A.  Juror Misconduct (Claim 4)[1]

Lytle contends that the jurors committed misconduct at his trial by consulting a dictionary. Second Amended Petition ("SAP"), p. 10. Specifically, Lytle asserts that several jurors used dictionaries to look up words in connection with the trial court's instruction that malice and maliciously meant "a wish to vex, annoy or injure another person or an intent to do a wrongful act." Traverse, p. 2. Lytle contends that as a result of this misconduct, the jury improperly considered the words "vex, annoy, disquiet" and "unsettled" as definitions for malice and maliciously.[2] Id.

The California Court of Appeal discussed the issue:

> In connection with count 2, the trial court instructed the jury that "the words 'malice' and 'maliciously' mean a wish to vex, annoy or injure another person or an intent to do a wrongful act." There was no record of the communications between the trial court and jury after the jury began deliberations. However, the parties stipulated that the trial court later gave the jury the word "disquiet" as a definition for "vex" in response to a jury question. Defendant brought a motion for a new trial in which he submitted evidence that several jurors looked up the word "disquiet" in the dictionary. The court also heard testimony from three jurors. One of the jurors testified that he wrote "vex, annoy, injure, disquiet" and "unsettled" on the board as the definition of malice. These were the only words written as a definition of malice. The People concede that the jurors' actions constituted jury misconduct . . . .

---

[1]Lytle's second amended petition contained 29 claims. As mentioned earlier, all but five of the claims were dismissed. The parenthetical reference to the claim number corresponds to the number of the claim in the second amended petition.

[2]The jury was instructed on the two elements of the § 246 offense:

> In order to prove this crime, each of the following elements must be proved:
>
> 1. A person discharged a firearm at an inhabited dwelling house; and
>
> 2. The discharge of the firearm was willful and malicious.
>
> As used in the preceding instruction only, CALJIC 9.03, the words "malice" and "maliciously" mean a wish to vex, annoy or injure another person, or an intent to do a wrongful act.

CT 479-480.

4

> Here the jury foreman testified that he was the only juror who wrote the definition of malice on the board in the jury room. He wrote "vex, annoy, injure, disquiet" and "unsettled." Thus, the trial court made an implied finding that these were the only words relied upon by the jury following their examination of a dictionary. [Lytle] counters that there is substantial evidence that there were other definitions considered by jurors. However, this court is bound by the trial court's implied findings that support the order denying the motion for a new trial . . . .
>
> [T]he definition considered by the jury did not lessen the prosecution's burden of proof regarding the mens rea of discharging a firearm at an inhabited dwelling. The trial court properly instructed the jury that "malice" and "maliciously" are defined as "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act . . . ." (§ 7.) However, as conceded by [Lytle], this definition is not exclusive. (Donati v. Righetti (1908) 9 Cal.App. 45, 49.) The jury also considered "disquiet," and "unsettled." "Annoy means to disturb or irritate, especially by continued or repeated acts; to weary or trouble; to irk; to offend; to disturb or irritate, esp. by continued or repeated acts [sic]; to vex; to molest . . . harm; injure." (People v. Lopez (1988) 19 Cal.4th 282, 289-290, internal quotations omitted.) "Disquiet" also means "disturb," (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 336), as does "unsettled." (Id. at p. 1296.) Since the words "disquiet" and "unsettled" are synonymous with "annoy," there was no prejudice to [Lytle] by the jury's misconduct.

Respondent's Exh. C (Cal Ct. App. Opinion, p. 14-17). In sum, the appellate court found that the jury engaged in misconduct by consulting a dictionary and considering the words disquiet and unsettled in addition to the court-supplied definition of malice or maliciously. The appellate court further found that this misconduct was not prejudicial.

The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence presented at trial. See Turner v. Louisiana, 379 U.S. 466, 472-73 (1965). Evidence not presented at trial is deemed "extrinsic." See Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir. 1987). Jury exposure to extrinsic evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment. See Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995). A petitioner, however, is entitled to habeas relief only if he can establish that the exposure to extrinsic evidence had "'substantial and injurious effect or influence in determining the jury's verdict.'" Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)). In other words, the error must result in "actual prejudice." See Brecht, 507 U.S. at 637.

5

Several factors are relevant, but nondispositive, in determining whether the alleged introduction of extrinsic evidence amounts to prejudicial error:

> (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict . . . .
>
> [O]ther factors that "might nonetheless suggest that the potential prejudice of the extrinsic information was diminished in a particular case" . . . include:
>
> [1] whether the prejudicial statement was ambiguously phrased; [2] whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; [3] whether a curative instruction was given or some other step taken to ameliorate the prejudice; [4] the trial context; and [5] whether the statement was insufficiently prejudicial given the issues and evidence in the case.

Sassounian, 230 F.3d at 1109 (citations omitted).

This court must defer to a state court's factual findings unless they are rebutted by clear and convincing evidence. Lambert v. Blodgett, 393 F.3d 943, 982 n.27 (9th Cir. 2004). Lytle fails to present evidence that the jury considered words other than vex, annoy, injure, disquiet, and unsettled as the definition for malice and maliciously. This court defers to the trial court's implied factual finding, as stated by the appellate court, that the jury considered only these words. Resp. Exh. C (Cal Ct. App. Opinion, p. 16).

"Dictionary definitions for terms used in the instructions directly implicate the law given by the court by which the jury's decision must be determined." Fields v. Brown, 2007 WL 2580788, *19 (9th Cir. 2007). The jury engaged in misconduct by consulting a dictionary and considering the terms found within as definitions for malice and maliciously. See id. The first four factors outlined in Sassounian weigh in favor of finding prejudicial error. It is undisputed that the words disquiet and unsettled were, at some point during deliberations, written on a board for the jury members to see. Further, the words were considered by the jury as definitions for malice and maliciously while the jury contemplated the verdict. The remaining factors, however, are critical in demonstrating that the misconduct was not prejudicial. As the appellate court noted, the dictionary words were synonymous with a term included in the trial court's instruction

6

on the definition of malice and maliciously. The definition of malice was not degraded by use of innocuous synonyms; therefore, the misconduct did not affect the verdict. Further, the court instructed the jury to base its decisions solely upon the evidence received at trial. RT 3141. Courts presume jurors have followed court instructions. Fields, 2007 WL 2580788, at *18. Additionally, the cumulative evidence in this case indicates that it would be difficult for a juror to have determined that Lytle did not act maliciously, even under the court-supplied definition of "an intent to do a wrongful act." Lytle admitted that his actions could be considered reckless, RT 2058, and that he intentionally retrieved the gun and pulled the trigger while the gun's barrel was inside the trailer, so that he would "scare the crap out of" the victim, RT 2524. The jury's consideration of dictionary definitions was not prejudicial given the trial context and evidence in the case.

The state court's denial of Lytle's claim was not contrary to nor an unreasonable application of Supreme Court precedent. Not only was the appellate court's harmless error analysis not objectively unreasonable, but Lytle also has failed to establish actual prejudice under Brecht due to juror misconduct. Lytle is not entitled to habeas relief on this claim.

B.  Denial Of Impartial Jury (Claim 9)

Lytle asserts that he was denied his due process right to an impartial jury. SAP, p. 42-43. Specifically, Lytle alleges that one juror refused to deliberate and another juror was upset by trial delays. Id.

The Sixth Amendment guarantees the criminally accused the right to a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted). The Constitution, however, "does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982). Voir dire, protective instructions, and other mechanisms to safeguard juror impartiality are not infallible, as "it is virtually impossible to shield jurors from every contact or influence that might

theoretically affect their vote." Id.  All due process requires is "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Id.

A juror who refuses to deliberate violates his or her sworn oath and compromises the jury's constitutional role. See United States v. Thomas, 116 F.3d 606, 608 (2d Cir. 1997). However, "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." Tanner v. United States, 483 U.S. 107, 127 (1987). Federal Rule of Evidence 606(b) and California Evidence Code § 1150(a), for example, prohibit the use of juror testimony to impeach a verdict when that testimony relates to intrinsic matters, i.e., the internal, mental processes by which the verdict was rendered. See Tanner, 483 U.S. at 116-27 (discussing Fed. R. Evid. 606(b)); People v. Cox, 53 Cal. 3d 618, 694-96 (1991) (discussing Cal. Evid. Code § 1150(a)).  Intrinsic or non-extrinsic evidence of juror misconduct is therefore rarely sufficient to overturn a verdict. See, e.g., United States v. Tierney, 947 F.2d 854, 868-69 (8th Cir. 1991) (allegations that jurors slept and read magazines during trial insufficient grounds for mistrial because allegations too vague and defendant unable to show jurors ignored any particularly important items).

Lytle asks this court to examine the jury's process of deliberation.  To do so, the court would have to contemplate the internal, mental processes by which the verdict was rendered; however, just "[a]s normal jury pressures and intra-jury influences may not be impeached by juror evidence, so also they constitute no grounds for overturning a verdict." Gov't of Virgin Islands Gereau, 523 F.2d 140, 151 (3rd Cir. 1975).

Even if this court could consider intrinsic evidence, relief would be warranted only if the jury's misconduct in deliberations prejudiced petitioner to such an extent that the trial was unfair. See Davis v. Woodford, 384 F.3d 628, 653 (9th Cir. 2004). The required prejudice did not exist here.

Lytle contends that juror # 8 was upset by trial delays, but is unable to show how this alleged state of mind affected deliberations. The only information suggesting that juror # 8 was upset by trial delays comes from Juror James' declaration that juror # 8 "was very upset by the

8

delays and felt the whole trial was a waste of her time." Petitioner's Exh. A2, p. 130. Juror Minuth, however, stated that juror # 8 and juror # 12 "could have been possible hold outs for murder[,]" suggesting that despite juror # 8's alleged mind-set, she was willing to deliberate. Petitioner's Exh. A5, p. 138. Further, Juror Minuth stated that juror # 8 was "stuck at 2nd degree" during the first jury vote, despite a majority of jurors advocating involuntary manslaughter. Id. at 139. This too suggests that whatever juror # 8's feelings were regarding the proceedings, a disagreement had arisen, and she did not feel compelled to rush to a verdict just to finish her jury duty term. Lytle has not shown that juror # 8's being upset by trial delays resulted in prejudice.

Lytle similarly fails to establish prejudice as a result of juror # 12's alleged refusal to deliberate. Lytle's strongest evidence on this claim is again a statement from Juror James, who said that juror # 12 "was rushing the jury . . . . He was impatient to make a decision." Petitioner's Exh. A2, p. 130. Additionally, Juror Minuth stated that juror # 12 could have been holding out for murder but "had a pending business trip and was going to have to leave the jury shortly if a verdict wasn't reached." Petitioners Exh. A5, p. 138. This statement does not show a refusal to deliberate by juror # 12. Further, Juror Minuth stated that as the jury went into deliberations, juror # 12 "began talking immediately. He wanted to be foreman." Id. at 139. Despite deliberations potentially conflicting with his business trip, juror # 12 was still interested in actively participating and even wanted to be foreman. Furthermore, the jury foreman stated that he was aware of "two jurors that had upcoming travel plans . . . but [the jury] knew they could get alternates and were willing to catch an alternate up if necessary." Petitioner's Exh. A1, p. 126. While it was generally known that juror # 12 possibly would have to leave the deliberations before a verdict was reached, Lytle fails to prove that this impacted juror # 12's willingness to deliberate. Indeed, the declarations indicate that juror # 12 wished to be an active member of the jury, and alternates were available in the event that juror # 12 did have to make an early departure.

The state court's silent denial of Lytle's juror misconduct claim was not contrary to nor an unreasonable application of Supreme Court precedent. Not only may a court not use juror

9

testimony to impeach a verdict based on intrinsic matters, but even if it could consider such matters, Lytle's contentions that juror # 8 was upset by trial delays and that juror # 12 was refusing to deliberate are insufficient to warrant habeas relief. Accordingly, Lytle is not entitled to habeas relief on this claim.

C.      Double Jeopardy (Claims 5 and 14)

The Double Jeopardy Clause of the Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V. In Benton v. Maryland, 395 U.S. 784 (1969), the Double Jeopardy Clause's protections were held applicable to the states through the Fourteenth Amendment. The guarantee against double jeopardy protects against successive prosecutions and multiple punishments for the same offense. See Witte v. United States, 515 U.S. 389, 395-96 (1995).

Protection against multiple punishments is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature. See Garrett v. United States, 471 U.S. 773, 793 (1985). Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause of whether punishments are "multiple" is essentially one of legislative intent. See Missouri v. Hunter, 459 U.S. 359, 366-68 (1983). When the legislature intends to impose multiple punishments, as for example in a sentence enhancement for use of a firearm in the crime, there is no double jeopardy. Plascencia v. Alameda, 467 F.3d 1190, 1204 (9th Cir. 2006).

1.      Claim 5

Lytle claims that his sentence with enhancements for personally discharging a firearm causing great bodily injury (§ 12022.53(a)(1)) and for inflicting great bodily injury (§ 12022.7(a)) violated his right to be free from double punishment.

The problem with this claim is that the enhancement for inflicting great bodily injury (§ 12022.7) was stayed when Lytle was sentenced. California's sentencing procedures make it impossible for Lytle to receive punishments on both enhancements. Under California law, when

10

several crimes are committed pursuant to a single intent and objective, the court imposes a sentence for the offense with the longest possible sentence and stays execution of the sentences on the other offenses. Cal. Penal Code § 654. The crime with the lesser punishment has a stayed sentence, and that stay becomes permanent when the primary sentence (i.e., the sentence on the offense with the longest possible sentence) is fully served. This stay of execution of sentence procedure "eliminate[s] the effect of the judgment as to the less severely punishable offense insofar as penalty alone is concerned." In re. Wright, 65 Cal.2d 650, 655-56 & n.4 (Cal. 1967). The procedure protects the rights of both the state (to impose a punishment on the less severely punishable offense if the greater offense/punishment is reversed or set aside for some reason) and the defendant (to avoid multiple punishments). See id. at n.4; People v. Beamon, 8 Cal.3d 625, 639-40 (Cal. 1973); People v. Niles, 227 Cal.App.2d 749, 755-56 (Cal. Ct. App. 1964). In essence, the stayed sentence is like an understudy, waiting in the wings and only to perform if the primary sentence cannot perform.

Here, Lytle will serve the sentence on the enhancement for discharging a firearm causing great bodily injury (§ 12022.53(a)(1)). Once he completes that sentence, the stay of the sentence on the enhancement for inflicting great bodily injury (§ 12022.7(a)) will become permanent and he will never incur any punishment for it. On the other hand, if at some point the enhancement for discharging a firearm is set aside, the enhancement for inflicting great bodily injury will be activated. If this latter situation occurs, Lytle again would be subject only to one sentence enhancement, and double jeopardy would not result.

2. Claim 14

Lytle asserts that the enhancements attached to the § 246 offense violated his right to be free from double jeopardy. SAP, pp. 64-65. Lytle claims that he cannot be charged under multiple statutes because he "used only one gun and fired only one shot." SAP, p. 64. The personal firearm use enhancement (§ 12022.5) was stricken as to this charge and therefore does not raise any double jeopardy concerns. The sentence on the great bodily injury enhancement (§ 12022.7) was stayed and does not raise double jeopardy claims for the reasons discussed in

11

the preceding section. The question is thus whether Lytle's sentences for the crime of shooting at an inhabited dwelling (§ 246) and the enhancement for personally discharging a weapon causing great bodily injury or death (§ 12022.53) violate his right not to be put twice in jeopardy.

If it is evident that Congress or a state legislature intended to authorize cumulative punishments, a federal court's inquiry is at an end. See Hunter, 459 U.S. at 369. Here, the text of the statute providing an enhancement for discharging a weapon causing great bodily injury or death expressly states that it applies to a § 246 offense, evincing a clear legislative intent to authorize cumulative punishments:

> (d) Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 12034, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life.

Cal. Penal Code § 12022.53(d). Section 12022.53 does not offend double jeopardy principles because "the legislature had simply determined that 'a criminal offender may receive additional punishment for any single crime committed with a firearm.'" Plascencia, 467 F.3d at 1204 (citation omitted).

Furthermore, the enhancement at issue is not identical to the underlying § 246 offense. While both address discharging a weapon, the enhancement contains the additional element of causing great bodily injury or death. The enhancement is consequently not punishing the same conduct as that addressed by the statute criminalizing the underlying offense. There were not multiple punishments for the same offense. The fact that only a single shot was fired is, quite simply, legally irrelevant to the double jeopardy analysis.

Lytle also contends that the imposition of an enhancement violated due process because there was only the single shot fired. He cites no legal authority for his argument, and it appears that it is basically an appeal to fairness – i.e., he doesn't think he should be liable on the enhancement because he fired only one shot. The argument is unpersuasive. The § 12022.53(d) enhancement targets the distinct problem of firearm use that causes personal injuries during

12

certain felonies. Cf. People v. Hutchins, 90 Cal. App. 4th 1308, 1313 (Cal. Ct. App. 2001) ("Clearly, in enacting [section 12022.53] the Legislature intended to mandate the imposition of substantially increased penalties where one of a number of crimes, including homicide, was committed by the use of a firearm.") The infliction of great bodily injury (or, indeed, any personal injury) is not necessary for a conviction under § 246. The enhancement in § 12022.53(d) applies only because Lytle caused great bodily injury or death when he shot at the inhabited dwelling. The enhancement for a shooting at an inhabited dwelling in which the defendant personally discharges a firearm that causes great bodily injury or death is legislation with a plainly rational basis. The existence of the enhancement did not violate due process.

The state court's denial of Lytle's claims was not contrary to nor an unreasonable application of Supreme Court precedent. The California legislature intended to authorize cumulative punishments when it enacted § 12022.53(d), and the underlying offense and enhancement are not punishing identical conduct. Lytle has not been subject to double jeopardy and is not entitled to habeas relief on this claim.

D.  Denial Of Due Process And A Unanimous Jury Verdict (Claim 15)

Lytle claims that the jury verdicts were too vague to support the sentence enhancement for discharging a weapon causing great bodily injury or death on the § 246 offense. Lytle contends that this violated his rights to due process and to a unanimous verdict. SAP, pp. 65-72. The jury found the following as to the enhancement:

> We, the jury in the above-entitled case, having found the defendant guilty of a felony offense in *Count 1 or Count 2*, find the special allegation that the defendant discharged a firearm, a shotgun, and caused great bodily injury in violation of Penal Code section 12022.53(d) to be true.

CT 407 (emphasis added). Lytle asserts that this finding does not conclusively establish that the enhancement was unanimously found true as to count 2's § 246 offense, because the enhancement instruction and the jury verdict form were phrased in the alternative.

"Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209,

221 (1982) (citations omitted). There is a paucity of Supreme Court precedent addressing the specific problem of an ambiguous verdict form on a sentence enhancement. Instructional error is generally subject to a harmless error analysis, i.e., the court must determine whether the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). That rule is of little help because the problem was in the verdict form rather than the instructions given. The other rule that potentially applies is the rule that, if a jury delivers a general verdict that may rest on either a legally valid or legally invalid ground, the verdict may not stand when there is no way to determine its basis. See Keating v. Hood, 191 F.3d 1053, 1062 (9th Cir. 1999), overruled on other grounds by Mancuso v. Olivarez, 292 F.3d 939 (9th Cir. 2002); see, e.g., Martinez v. Garcia, 379 F.3d 1034, 1039 (9th Cir. 2004) (due process violation in one of two alternative instructions; given general verdict, harmless error analysis inappropriate). That rule also is not a good fit, because the verdict form here was not a general verdict. Even though these general rules do not fit well, applying their principles leads to the determination that Lytle's right to due process has not been violated.

Although the wording on this part of Lytle's verdict was ambiguous – allowing the finding to be made if Lytle had been found guilty of count 1 or count 2 – this is not a situation where the court is unable to determine which of the two grounds (only one of which was permissible) was relied upon by the jury to reach the verdict. The paragraph in question was just part of the multi-page verdict. When considered as a whole, the verdict was not ambiguous: the jury had found the facts necessary to permit the imposition of the enhancement as to count 2. It can be said with certainty that the sentence enhancement was not imposed based on a legally invalid ground or one as to which the jury had not made the necessary findings.

It can be reasoned from various instructions and verdict forms that the necessary findings were made to support the § 12022.53(d) enhancement for the § 246 offense. To impose the § 12022.53(d) enhancement, the jury had to determine that (1) while committing the § 246 offense (2) Lytle personally and intentionally discharged the firearm (3) causing great bodily injury. It can be determined from the instructions given and the various verdict forms completed that the jury found true each of these points. As to the first point, the jury found Lytle guilty of the

14

§ 246 offense of shooting at an inhabited dwelling. CT 404. The court had instructed the jury that in order to find Lytle guilty on the § 246 offense, the jurors had to find that Lytle acted willfully and with criminal intent. CT 480-82. As to the second point, the proof is not quite so clear, but the guilty verdict on the § 246 offense was only possible if the jury found that the person had discharged a firearm, see CT 479, and the jury found that Lytle had personally used and discharged a firearm in the commission of the murder, see CT 408, 409, 508. As to the third point, the jury returned a verdict that found true the allegation that he inflicted great bodily injury as defined in § 12022.7(a). CT 405, 507. The court had instructed the jurors as to this enhancement that they must determine whether Lytle "personally inflicted great bodily injury." CT 507. In sum, the jurors found each of the facts necessary to the § 12022.53(d) enhancement true as to count 2. The inexact phrasing of the verdict form on the § 12022.53(d) enhancement was harmless error.

Additionally, as a practical matter, it does not appear that the jury intended to find true the enhancement as to one crime and not the other. Lytle repeatedly argues here – echoing his position at trial – that he "used only one gun and fired only one shot." SAP, p. 64.[3] There was no evidence or argument that anyone else was present or involved in the discharge of the gun. The single action by Lytle led to all the charges and enhancements. Since that single shot led to both the murder and § 246 convictions, there is no possibility that the jury found the enhancement true as to the murder but not the § 246 offense.

The state court's denial of Lytle's claim was not contrary to nor an unreasonable application of Supreme Court precedent. No prejudice resulted from the alternative phrasing of the verdict form. Lytle is not entitled to habeas relief on this claim.

---

[3] At trial, Lytle disputed that he intended to hit the victim with the gunshot, but unequivocally stated that he fired the gun: "I wanted to scare her, to get her to listen to me. I got the gun, I loaded it, I took the safety off, I walked back to the window, I stuck the barrel in the window past the curtain, and fired." RT 2033. The trailer bedroom into which he fired the gun was 11' x 6'.

15

**CONCLUSION**

For the foregoing reasons, the second amended petition for a writ of habeas corpus is DENIED. The clerk shall close the file.

DATED: November 7, 2007

SUSAN ILLSTON
United States District Judge